IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**OREGON NATURAL DESERT ASSOCIATION, and AUDUBON SOCIETY OF PORTLAND,**

       Plaintiffs,

  v.

**SALLY JEWELL, Secretary of the Interior, and BUREAU OF LAND MANAGEMENT,**

       Defendants,

**COLUMBIA ENERGY PARTNERS, LLC, And HARNEY COUNTY,**

       Intervenor-Defendants.

No. 3:12-cv-00596-MO

OPINION AND ORDER

**MOSMAN, J.**,

    Plaintiffs, the Oregon Natural Desert Association and the Audubon Society of Portland (collectively "ONDA"), alleged that defendants, the Bureau of Land Management and the Secretary of the Interior (collectively "BLM"), violated the National Environmental Policy Act

1 – OPINION AND ORDER

("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, when they issued a Final Environmental Impact Statement ("FEIS") and Record of Decision ("ROD") approving the grant of a right-of-way for the North Steens Transmission Line associated with the Echanis Wind Energy Project.  ONDA challenges BLM's decision pursuant to the Administrative Procedure Act, 5 U.S.C. §§ 701–706.  The developer of the project, Columbia Energy Partners, LLC ("CEP"), and the local government entity, Harney County, intervened in support of BLM.

Currently before the court are motions for summary judgment from each of the parties— ONDA [37], Harney County [44], CEP [46], and BLM [51]—and motions from BLM [53] and CEP [48] to strike portions of the  declarations and exhibits attached to ONDA's motion for summary judgment.  The central issue in this case is whether BLM's FEIS and the associated ROD complied with NEPA.[1]

ONDA raises seven main reasons for which the agency's decision should be overturned:

I.    BLM failed to consider the impact of the project on fragmentation and connectivity of sage-grouse habitat.

II.    BLM failed to follow its own policies relating to sage-grouse and golden eagles.

III.    The FEIS contained inadequate information about the impacts of the project on sage-grouse and golden eagles.

IV.    BLM failed to consider and respond to other agencies' critical comments.

V.    BLM failed to specify required mitigation measures and relied on the assumption that Harney County would require mitigation for the impacts to private land.

VI.    BLM failed to analyze the effectiveness of the proposed mitigation measures.

VII.    BLM failed to allow public comment on the wholesale changes it made between the Draft and Final EIS.

---

[1] I dismiss ONDA's claim under the Steens Act and the Federal Lands Policy and Management Act because no party has briefed these claims and ONDA has acknowledged that this claim should be dismissed.  (Pl. Reply Br. [57] at 2 n.1.)

On the first issue, I find that BLM adequately considered the project's impacts on fragmentation and connectivity. The FEIS acknowledges that sage-grouse would be affected by fragmentation and the importance of connectivity to the persistence of the species. It contains a reasonably thorough discussion of the scientific literature surrounding fragmentation and discloses conflicting authority. Although the FEIS does not discuss connectivity separately, its analysis of fragmentation necessarily addresses connectivity because the two concepts are inherently intertwined.

On the second issue, I find that BLM did not arbitrarily and capriciously fail to follow its own policies. A careful analysis reveals that BLM complied with all of the policies that ONDA says it violated, even those that were not applicable.

On the third issue, I find that BLM's surveys and data were adequate. The agency obtained enough information that it could make a reasonable decision to proceed with the project, after requiring mitigation.

On the fourth issue, I find that BLM adequately considered and responded to comments from other agencies. BLM was not required to accede to all of its sister agencies' requests. Furthermore, many of the critical comments cited by ONDA were made early in the NEPA process, and by the time the ROD was released, the sister agencies' comments were more positive.

On the fifth issue, I find that BLM was not required to specify required mitigation measures and was entitled to rely on Harney County to impose mitigation on private land. An agency need not have a fully developed and enforceable mitigation plan in place before it can act. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 353 (1989). Furthermore, an agency may rely on the state or local agency that has jurisdiction over the area in question to

implement appropriate mitigation.  *See id.*  Here, BLM actually conditioned issuance of a Notice to Proceed on  Harney County requiring a Habitat Mitigation Plan.  BLM did all it was required to do and more.

On the sixth issue, I find that BLM's assessment of mitigation effectiveness was sufficient.  The FEIS discusses the effectiveness of some mitigation measures and the effectiveness of other measures is obvious.  Because it adopted what the parties agree is the best and most recent document on sage-grouse mitigation—the Oregon Department of Fish and Wildlife's Mitigation Framework—BLM was not required to discuss the effectiveness of each mitigation measure therein.  Similarly, BLM alleviated the need for an in-depth discussion of eagle, bird, and bat mitigation effectiveness by adopting an adaptive management approach, which provided for an ongoing analysis of mitigation effectiveness.

On the seventh issue, I find that BLM was not required to request public comment on the FEIS, despite making many changes and additions.  Additionally, ONDA was permitted by regulation to comment on the FEIS and chose not to do so.  *See* 40 C.F.R. § 1503.1.

As a result of my findings on these issues, I deny ONDA's motion for summary judgment and grant BLM's motion for summary judgment.  CEP and Harney County filed motions for summary judgment asserting essentially the same arguments as BLM, and for the same reasons that I grant BLM's motion, I also grant their motions.  I deny the motions to strike.

## THE NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA") requires that when a major federal action would significantly impact the quality of the human environment, the action agency must prepare an Environmental Impact Statement ("EIS") to consider the environmental impacts of

and alternatives to the proposed action.[2]  42 U.S.C. § 4332(C).  NEPA is a procedural statute that does not impose any substantive requirements or mandate a particular outcome.  *Robertson*, 490 U.S. at 350.  The purpose of NEPA is to ensure that the agency and the public have available and consider the relevant information.  *See, e.g.*, *Or. Natural Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1099 (9th Cir. 2010).

An EIS is prepared in stages.  In the initial "scoping" stage, the agency accepts public comments about what the EIS should cover.  40 C.F.R. § 1501.7.  Then it prepares a Draft EIS ("DEIS") and accepts public comment on that document.  40 C.F.R. Pts. 1502 & 1503.  The agency must respond to the comments received and include its responses in the Final EIS ("FEIS").  *Id.*  The agency must consider the FEIS before taking the proposed action.  In the final step in the process, the agency issues a Record of Decision ("ROD") announcing its final decision and the reasons for it.  40 C.F.R. § 1505.2.

Under NEPA, the agency is required to take a "hard look" at the environmental effects of its actions.  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 374 (1989).  An EIS must "provide full and fair discussion of significant environmental impacts" of the proposed actions. 40 C.F.R. § 1502.1.  Courts employ a "rule of reason" and ask whether the EIS contains a "reasonably thorough discussion of the significant aspects of the environmental consequences." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1071 (9th Cir. 2002)(citation omitted).

## BACKGROUND

The agency action at issue in this case is the BLM's decision to grant a right-of-way for the North Steens 230-kV Transmission Line Project.  The transmission line is necessary to connect the proposed Echanis Wind Energy Project in Harney County, Oregon, to the power

---

[2] In situations where the action would not have a significant impact, the agency can prepare a less-intensive Environmental Assessment instead of a full-blown EIS.  Here, the BLM immediately acknowledged that the impacts of this action would be significant and went directly to an EIS.

grid.  Approximately 12 miles of the 46-mile transmission line would cross public land administered by the BLM, covering a total of 246.24 acres of public land.  AR 00013; AR 01899.

The Echanis Project is located on Steens Mountain in southeastern Oregon.  Steens Mountain is a vast and scenic mountain that extends for 50 miles, reaching an elevation of 9700 feet.  It provides recreational opportunities as well as valuable habitat for wildlife, including sage-grouse and golden eagles.  (Pl. Opening Br. [37] at 3–4.)  Impacts to these two species are at the heart of ONDA's challenge.

The Echanis  Project is sited entirely on 10,362 acres of private land.  AR 01896. Echanis will be a 104-megawatt facility containing 40 to 69 wind turbines.  AR 01951.  Harney County has issued a Conditional Use Permit to the developer CEP to proceed with the project. However, because the project would not be constructed without the transmission line right-of-way, BLM considered the entire project to be a federal action for purposes of the NEPA analysis.[3]  CEP initially proposed two additional wind developments—the East Ridge and West Ridge Projects—but it withdrew those proposals in 2009 and officially canceled the additional projects in 2011, citing business, regulatory, and environmental concerns.  AR 00014.

CEP submitted an application for a right-of-way in December 2008.  BLM published a notice of intent to prepare an EIS on July 27, 2009.  The DEIS was released in July 2010.  After receiving and considering comments from other agencies and the public, BLM released the FEIS on October 21, 2011, and the ROD on December 28, 2011.  BLM granted the right-of-way to CEP on March 16, 2012, and issued a limited Notice to Proceed on May 21, 2012.  However, the Notice to Proceed was revoked on February 22, 2013, because the project was on hold due to this

---

[3] Whether or not to "federalize" a project, that is to consider the private project along with the federal action in the NEPA analysis, is an oft-litigated issue.  Here, BLM decided to federalize the Echanis Project right away, and ONDA applauds this decision.  Tr. Oral Argument July 22, 2013, at 5.

litigation.  Currently, CEP retains the right-of-way but has no right to undertake any construction

or pre-construction activities until it obtains a new Notice to Proceed from BLM.

As the lead agency, BLM is ultimately responsible for the production and content of the

EIS.  During the NEPA process, BLM worked closely with CEP and Harney County, and with

the United States Fish and Wildlife Service ("FWS") and the Oregon Department of Fish and

Wildlife ("ODFW").  ONDA submitted comments during the initial scoping process and also

commented on the DEIS.

### I.    <u>Sage-Grouse</u>

The greater sage-grouse is a "Candidate Species" that warrants protection under the

Endangered Species Act but has not been listed as threatened or endangered because FWS

concluded that listing the species was precluded by the higher priority needs of other species.

AR 02185; AR 16098.  Although the Endangered Species Act does not protect sage-grouse at

this time, FWS encourages voluntary conservation efforts, AR 02185, and the species is covered

by several of BLM's internal policies.  Recently, ODFW released two documents related to

Oregon's sage-grouse:  *Greater Sage-Grouse Conservation Assessment and Strategy for Oregon:*

*A Plan to Maintain and Enhance Populations and Habitat* ("Conservation Strategy") and

*Implementing Habitat Mitigation for Greater Sage-Grouse Under the Core Area Approach*

("Mitigation Framework").  AR 02183; AR 02188.  BLM relied heavily on these documents in

preparing the FEIS, stating that they represent the best available science.  AR 02183; AR 02187.

Although sage-grouse populations are declining nationwide, the population in Oregon is

"secure" and "doing relatively well."  AR 02184–85.  Sage-grouse require suitable habitat for

persistence, and the Steens Mountain area contains important, high-quality sage-grouse habitat.

AR 02184.  Habitat fragmentation is a key factor in sage-grouse population decline, and the

FWS determined that maintaining habitat connectivity is essential to the persistence of the species. AR 16104–11. Renewable energy development has contributed to degradation of sage-grouse habitat. AR 02185.

Sage-grouse congregate in an open area called a "lek" for mating displays and then disperse, usually 2 to 4 miles but up to 12.5 miles from the lek, for nesting. AR 02183–88. In the summer females and chicks inhabit wetland areas where they feed on plants and insects, and during the winter, the birds reside in areas where sagebrush extends above the snow because their winter diet consists entirely of sagebrush leaves and buds. AR 02185; AR 16103–05. One lek, the Little Kiger Lek, is located as close as 1.2 miles from the Echanis Project access road, but due to topography is not within sight of the project. AR 02205; Tr. Oral Argument July 22, 2013 ("Tr.") at 52. No known leks are located within 3 miles of the turbine site. AR 02205.

## II.   Golden Eagles, Other Birds, and Bats

Golden eagles are protected under the Bald and Golden Eagle Protection Act and the Migratory Bird Treaty Act, and evidence suggests that golden eagle populations may be declining throughout their range. AR 02190. Golden eagles are known to be present in the project area. AR 02190. Four inactive nests were discovered within the Echanis Project site, and 14 eagles were spotted along the transmission line route during surveys. AR 02190–91.

The FEIS states that golden eagles would be directly affected by the project through both disturbance and mortality. AR 01905. Because the project is expected to kill golden eagles, CEP must obtain a "take" permit from FWS under the Bald and Golden Eagle Protection Act. AR 01971.

Although ONDA's concerns center around the impacts to golden eagles, it is also concerned about impacts to other avian species and bats. Tr. at 5. In addition to golden eagles,

the FEIS discusses other special status raptor species, but concludes that they would rarely be present in the project area as it does not match their habitat needs. AR 02206. Five special status bat species were identified in surveys at the Echanis Project site. AR 02204. The combined Avian and Bat Protection Plan and Eagle Conservation Plan ("Avian Plan"), which is incorporated in the FEIS, addresses all avian and bat species. AR 02204–05.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In challenges to final agency action under the Administrative Procedure Act, summary judgment is appropriate for deciding the legal issue of whether the agency could reasonably have found the facts as it did. *See Occidental Eng'g Co. v. Immigration & Naturalization Serv.*, 753 F.2d 766, 770 (9th Cir. 1985).

When reviewing agency action under the Administrative Procedure Act, the courts asks whether the action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir. 1986). Review under this standard is narrow, and a court is not to substitute its judgment for that of the agency. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The court must evaluate "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). An agency action is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Courts are at their most deferential when reviewing scientific judgments and analyses within the agency's expertise. *Lands Council v. McNair*, 629 F.3d 1070, 1074 (9th Cir. 2010) (*citing Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983)). "When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive." *Marsh*, 490 U.S. at 378.

## ANALYSIS

### I.   BLM adequately considered the impact of the project on fragmentation and connectivity of sage-grouse habitat.

One of ONDA's concerns with regard to the Echanis Project is that access roads and other development associated with the project and the transmission line will fragment sage-grouse habitat and decrease connectivity in the Steens Mountain area. ONDA argues that the FEIS fails to assess the impacts of the project on fragmentation and connectivity of sage-grouse habitat. (Pl. Opening Br. [37] at 33–34.) ONDA also argues that the FEIS misinterprets the scientific literature and fails to apply it meaningfully. (Pl. Opening Br. [37] at 34.) In his extra-record declaration and the attached exhibits, ONDA's expert Dr. Miller uses maps to demonstrate the project's effect on fragmentation and connectivity. (Miller Decl. [42] at ¶¶ 44–70; Exs. A, D–L.)

Habitat fragmentation occurs when a contiguous block of a species' habitat is divided into smaller parts. Fragmentation may decrease connectivity—the continuity that enables members of a species to move between habitat areas and is important to maintaining genetic

diversity.  Habitat fragmentation has been recognized as a factor in the decline of sage-grouse populations.  AR 16112.

After reviewing the record, I find that the agency's discussion of habitat fragmentation was adequate.  The FEIS acknowledges that sage-grouse can be displaced from their habitat due to fragmentation.  AR 02205; AR 02226.  It also states that habitat connectivity is essential for persistence of the species.  AR 02185.  The FEIS cites three scientific documents on which it relied for sage-grouse information—ODFW's Conservation Strategy, FWS's *Notice of 12-Month Findings for Petitions to List the Greater Sage-Grouse*, and *Greater Sage-Grouse: Ecology and Conservation of a Landscape Species and Its Habitats*.  AR 02183–84.  The FEIS also discloses conflicting authority.  AR 02227.  Based on the scientific information that it reviewed, BLM concluded that, "fragmentation by rarely traveled dirt roads has not been shown to have a negative influence upon lek persistence."  AR 03032–33.

The concepts of fragmentation and connectivity are inherently intertwined.  ONDA acknowledges this in its briefing when it states that the project "would fragment essential sage-grouse <u>connectivity</u> habitat on Steens Mountain."  (Pl. Opening Br. [37] at 34.)(emphasis in original).  By discussing habitat fragmentation while acknowledging the importance of connectivity, the FEIS necessarily assesses the project's impact on connectivity.  I find that BLM could have reasonably decided that fragmentation and connectivity are closely related, or even inextricably intertwined, and chosen to discuss them together.  In this matter of scientific judgment, I defer to the agency's expertise and decline to substitute my judgment for that of the agency.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Lands Council*, 629 F.3d at 1074.

## II.    BLM's actions did not conflict with its sage-grouse and eagle policies.

ONDA argues that BLM violated its own policies when it issued the ROD, making the agency's action arbitrary and capricious.  (Pl. Opening Br. [37] at 37–40.)  Specifically, ONDA claims that BLM violated its Special Status Species Policy, National Sage-grouse Habitat Conservation Strategy, two new sage-grouse Instruction Memoranda ("IMs") issued on December 27, 2011, and an Eagle IM.  (Pl. Opening Br. [37] at 37–39.)  I discuss each policy in turn.

ONDA argues that BLM violated the Special Status Species Policy, SAR 000538, by failing to ensure that issuance of the right-of-way would not contribute to the need to list sage-grouse under the Endangered Species Act.  However, the FEIS contains a thorough discussion of special status species, and it does not indicate that this project will contribute to the need to list any of these species.  AR 02180–91.  I am neither authorized nor qualified to make an independent determination that this project may contribute to the need to list sage-grouse under the Endangered Species Act, so I defer to BLM's expertise.[4]  *See Lands Council*, 629 F.3d at 1074.  I decline to hold that BLM's decision violated the Special Status Species policy and was thus arbitrary and capricious.

ONDA argues that BLM violated its National Sage-grouse Habitat Conservation Strategy, SAR 000995, by failing to use the best available science.  However, in the FEIS, BLM stated that ODFW's Conservation Framework, which it followed, represents the best available science.  AR 02183.  I decline to decide what constitutes the best available science, and I defer to the agency on this point.  *See Lands Council*, 629 F.3d at 1074.

---

[4] ONDA partially bases its argument on critical comments that FWS provided on the DEIS.  (Pl. Opening Br. [37] at 37.)  This evidence is not persuasive because FWS's comments on the DEIS do not reflect the agency's opinion of the project and analysis as finalized and approved in the FEIS and ROD.

ONDA argues that BLM violated two IMs regarding sage-grouse that were issued one day before the ROD was signed by failing to mention, consider, or adhere to the policies contained in the IMs.  It is unsurprising that the FEIS and ROD fail to discuss documents that emerged one day before the ROD was finalized, and BLM's action was not arbitrary and capricious in light of this time frame.  Moreover, BLM complied with the substance of the IMs, neither of which is actually applicable to the actions at issue in this case.  IM 2012-044 provides that BLM should consider relevant conservation measures when amending land use plans in sage-grouse habitat.  AR 00257.  The agency action at issue here is not the amendment of a land use plan, and therefore IM 2012-044 does not apply.  IM 2012-043 provides that BLM should seek to maintain, enhance, or restore priority habitat for sage-grouse.  AR 00261.  This IM applies to permit applications where BLM has issued or will issue a DEIS.  AR 00262.  IM 2012-043 does not apply to the situation at hand where an FEIS had already been issued and a ROD was issued one day after the IM.  Regardless, BLM complied with this IM by coordinating with ODFW, applying ODFW's Conservation Strategy and Mitigation Framework, and imposing a no-net-loss-net-benefit standard for sage-grouse habitat.  For all of the above reasons, I find that BLM's action was not arbitrary and capricious.

ONDA argues that BLM violated its Eagle IM by approving the ROD without a letter of concurrence from FWS stating that the Avian Plan was adequate.  However, the record does not contain a letter from FWS to BLM confirming that FWS had worked with CEP to develop an Avian Plan.  Furthermore, BLM is not obligated to follow the Eagle IM in this situation.  BLM only needed a letter of concurrence under the IM if its action required a take permit.  Tr. at 56.  Here, BLM is not permitting the Echanis Project; Harney County is.  BLM is simply analyzing the Echanis Project as a connected action under NEPA.  Therefore, BLM does not need a take

permit or a concurrence letter.  Tr. at 56.  Because ONDA's broad allegations that BLM violated

its own policies are unfounded, as explained above, I find that BLM's decision was not arbitrary

and capricious.

> ### III.   The FEIS contained adequate information about the impacts of the project on sage-grouse and golden eagles.
>
> #### A.   *Sage-grouse*

BLM obtained information about sage-grouse using habitat mapping and surveys.  Tr. at

42–43.  ONDA argues that BLM's surveys for sage-grouse and mapping of sage-grouse habitat

were inadequate, and therefore BLM did not have enough information about sage-grouse

presence in and use of the area to make an informed decision about how sage-grouse would be

impacted by the project.  (Pl. Opening Br. [37] at 28–33.)

I find that BLM had adequate information.  BLM conducted general avian use surveys at

the Echanis Project site from August 21 to November 9, 2007, in which "sage-grouse were

frequently flushed," and a total of 37 sage-grouse were counted.  AR 02186.  From July 25 to 31,

2008, BLM conducted special status wildlife surveys at the Echanis site, which recorded 12

individual sage-grouse.  AR 02186.  BLM also surveyed the transmission line route for multiple

weeks in each of the four seasons, and those surveys turned up no sage-grouse.  AR 02186; AR

02905–08.  Finally, BLM consulted winter survey data from the East and West Ridge sites, both

of which are located at a lower elevation than the Echanis site.  AR 02187.  Although it only

surveyed the Echanis Project site between July and November, BLM believes that the data from

winter surveys at the lower elevation East and West Ridge sites enable it to infer that no sage-

grouse use the higher elevation Echanis Project site in the winter.  AR 02187.  BLM also mapped

wildlife habitats using vegetation communities, land forms, and field assessments.  AR 02091;

AR 02166.

The FEIS acknowledges that sage-grouse are present at the Echanis site and also assumes that they are present at the transmission line route, despite the fact that no sage-grouse were observed in surveys of the transmission line.  The FEIS notes that the Little Kiger Lek is located as close as 1.2 miles from the Echanis Project access road.  AR 02205.  However, no known leks are located within 3 miles of the turbine site.  AR 02205.

While the effects of wind energy development on sage-grouse populations have not been adequately studied, the FEIS states that there is the potential for conflict.  AR 02187.  The FEIS also acknowledges that oil and gas development have been found to negatively impact sage-grouse populations.  AR 02187.  BLM concludes, "[u]ntil empirical data are available that quantify the effects of [wind energy development] on greater sage-grouse populations, interim guidance from the ODFW is being used to quantify areas of impact of projects on greater sage-grouse."  AR 02205.

It is certainly correct, as ONDA asserts, that BLM could have done further surveys and gathered additional data.  But that is not the question before me.  I must decide whether BLM knew enough about sage-grouse so that its decision to proceed with the project was informed, rather than arbitrary.  NEPA does not require perfect information.  BLM was not required to tally up the exact number of birds in the affected area.  Tr. at 10.  What NEPA does require is for BLM and the public to have information about reasonably likely significant impacts so they can make an informed decision.

BLM dealt with the fact that it lacked complete information about sage-grouse by assuming that sage-grouse were present throughout the project area at all times and requiring mitigation accordingly.  ONDA agrees that mitigation, even when it post-dates the ROD, can be a reason for upholding an agency's decision.  Tr. at 17.  I find that BLM had enough information

before it to infer that sage-grouse would be impacted.[5]  BLM then made a reasonable decision to impose mitigation measures and approve the project.

## B.   *Golden Eagles*

ONDA also argues that BLM's eagle surveys were inadequate and inaccurate.  (Pl. Opening Br. [37] at 42–44.)  ONDA relies on the extra-record declaration of Dr. Smallwood, a raptor expert, who criticizes BLM's survey methods and data based on his professional experience and on his 2012, post-ROD visit to the site.  (Smallwood Decl. [41] ¶¶ 1, 4.)  Many of the issues in Dr. Smallwood's declaration were raised to and addressed by the agency during the DEIS comment period.  Tr. at 58.  BLM and CEP have moved to strike Dr. Smallwood's declaration.  I deny that motion.[6]  However, the declaration does not persuade me that BLM's decision was arbitrary and capricious.

I find that BLM undertook sufficient surveys to understand raptor presence in the area. BLM surveyed for raptors as part of the general avian use surveys in August through November of 2007.  AR 02171.  BLM also conducted nest surveys at the Echanis site and the transmission line route, noting whether the nests were active or inactive.  AR 02171–72.  Although BLM did not follow FWS's recommendation to conduct nest surveys within 10 miles of the project, it did respond to concerns raised by FWS and ODFW related to the turbine array, proximity of the project to treed areas, and wind conditions conducive to soaring.  AR 02208.

The FEIS acknowledges that raptors are present at the Echanis site, but states that they were observed over canyons and away from ridges where turbines would be located.  AR 02206.

---

[5] As part of this decision, I defer to BLM's reasonable and adequately-explained decision to make inferences about sage-grouse winter use of the project area from the winter data gathered at the East and West Ridge sites, as this is a matter of interpreting scientific data within the agency's expertise.

[6] Although I deny the motion, I am concerned by the practice of hiring experts to analyze and critique an EIS after the ROD has been issued.  Such an independent expert analysis should be presented to the agency in comments on the DEIS or FEIS when the agency can take it into account, instead of after the agency has made its final decision and issued the ROD.

The closest active golden eagle nest to the Echanis site was 2.5 miles away.  AR 02206.  The FEIS evaluated the potential impacts on raptors by analyzing how a number of "Danger Zone Factors" for wind energy projects, including topographic features and proximity to foraging sites and prey, would apply at the Echanis site.  AR 02207.  BLM estimated golden eagle mortality from the project at 1.7 eagles per year, using what it considers to be the best available information.  AR 02209.

The FEIS and ROD incorporate the Avian Plan, which takes an adaptive approach to eagle conservation and mitigation.  The Avian Plan provides for mandatory turbine curtailment (temporary shut down) if wind conditions increase the likelihood of an eagle collision. AR 02200; AR 02973.  The location and duration of curtailment would depend on the number and location of documented eagle fatalities that have occurred up to that time.  AR 02976.  The ultimate goal of the Avian Plan is no net loss of eagles.  AR 02209.  The Echanis Project will also require a take permit from FWS which will be valid for five years.  During this time, data will be collected, and the permit conditions will be refined if necessary at the end of the period. AR 02209.

I find that BLM had sufficient data about eagles in the area to enable it to determine that eagles would be impacted and to decide to impose stringent mitigation measures.  In light of the data it had and the mitigation it required, I find that BLM's decision was not arbitrary and capricious.

IV.    **BLM adequately considered and responded to other agencies' critical comments.**

ONDA argues that BLM's decision to issue the ROD and approve the project was arbitrary and capricious because BLM failed to respond to critical comments from other agencies and to act on those agencies' recommendations.  (Pl. Opening Br. [37] at 33, 42.)  ONDA points

to examples throughout the record of FWS's comments that the EIS lacked sufficient data and that further surveys were necessary.  *See, e.g.*, AR 14689–90.  For example, FWS's comments on the DEIS recommended eagle surveys within 10 miles of the project boundary.  However, BLM never obtained the additional data requested by FWS; it only surveyed within two miles of the project.

Although BLM did not accede to FWS's request for additional surveys, the FEIS does specifically respond to many of FWS's articulated concerns about impacts to eagles.  In response to FWS's concern that eagles would not be able to pass through a "picket fence" turbine layout, BLM provided calculations showing that there would be a 176-meter space between the turbines' rotor areas.  AR 02208.  In response to FWS's concern that the turbines would be located in close proximity to treed areas, BLM consulted maps showing that nearly every turbine would have a treeless buffer of at least 100 meters.  AR 02208.  In response to FWS's concern that the presence of seasonal winds might create soaring conditions which lead to collisions, BLM determined from three years of on-site meteorological data  that such conditions occur infrequently.  AR 02208.

FWS's comments were most critical in the earlier stages of the NEPA process.  On the final drafts of the ROD, which presents all of the mitigation plans designed to address the impacts and information deficiencies that concerned FWS and that are the basis of ONDA's challenge, FWS's comments were favorable.   FWS stated,

> BLM has done an excellent job on this final draft product.  We appreciate the manner and extent to which our previous comments have been addressed.  This draft is much tighter than its first iteration.  If we can get these last few issues addressed and if the ROD is not weakened through subsequent revisions, we think it can serve as an excellent model for application elsewhere; we will recommend to our regional and national management that FWS should be prepared to support it.

AR 00591.

18 – OPINION AND ORDER

FWS's concerns, particularly those expressed during the earlier stages of the process, do not by themselves invalidate the FEIS, *see Akiak Native Cmty. v. U.S. Postal Serv.*, 213 F.3d 1140, 1146 (9th Cir. 2000), because there need not be a "unanimity of opinion among agencies." *Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1088 (9th Cir. 2013). BLM did not have to defer to FWS's concerns, but it did need to consider and respond to them. *See Akiak Native Cmty.*, 213 F.3d at 1146.

I find that it did so. For example, as discussed previously, the FEIS explicitly responds to some of FWS's concerns by discussing the "picket fence" turbine layout, proximity of the project to treed areas, and the presence of seasonal winds that might create soaring conditions and lead to collisions. AR 02208. In response to FWS's comments on earlier drafts that the project would have significant unmitigated impacts to sage-grouse and eagles, BLM incorporated mitigation plans in the FEIS and the ROD. *See* AR 02945. FWS's critical comments early in the EIS process do not mandate rejection of the FEIS or make BLM's decision to proceed with the project arbitrary and capricious.

**V.    BLM was not obligated to have an enforceable mitigation plan in place when it approved the project and was entitled to rely on the assumption that Harney County would require mitigation for the impacts to private land.**

ONDA challenges BLM's failure to specify mitigation measures and its reliance on the assumption that Harney County would require mitigation for impacts to private land. (Pl. Opening Br. [37] at 47–48.) However, the record shows that the FEIS and the ROD do discuss mitigation extensively. Also, BLM incorporated several mitigation and conservation plans in the FEIS and the ROD, including the Avian Plan, a Habitat Mitigation Plan ("HMP"), a Weed Management and Control Plan, a Revegetation Plan, and a Spill Prevention Plan. AR 00031-35; AR 02945.

BLM also conditioned grant of the right-of-way on adoption of the HMP into CEP's permits from both BLM and Harney County.  AR 00116; AR 00125.  Harney County imposed the elements of the HMP as Condition 8 to the Conditional Use Permit and has jurisdiction under the permit to enforce it.  AR 00036–37.  This means that the same mitigation measures will be required on public and private land.

NEPA requires that an EIS discuss mitigation in sufficient detail that environmental consequences can be evaluated.  *Robertson*, 490 U.S. at 351–52.  Of course, because it is a procedural statute, NEPA does not require that any harms actually be mitigated.  *See S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 727 (9th Cir. 2009).  The Supreme Court has clarified that the requirement that mitigation be discussed does not mean mitigation plans must be fully formulated and enforceable before an agency can act.  *Robertson*, 490 U.S. at 353.  Additionally, NEPA does not require the lead agency to obtain assurance that third parties will implement particular mitigation measures.  *Id.*

The Supreme Court has made clear that BLM need not have a fully-developed and enforceable mitigation plan in place before it can act, so to the extent that ONDA is making that argument, it fails.  *See id.*  BLM also does not have to be certain that Harney County will implement the mitigation measures on private land.  *See id.*  Instead, BLM was entitled to assume that Harney County would require mitigation and enforce the HMP as incorporated in the Conditional Use Permit.  BLM required mitigation for the impacts to public land and reasonably assumed that Harney County would require mitigation on private land, so its decision was not arbitrary and capricious.[7]

---

[7] Indeed, it is somewhat ironic that ONDA is challenging the sufficiency of BLM's mitigation measures in this case where BLM has taken the extraordinary measure of requiring mitigation on private land by making this a condition of the right-of-way grant.

## VI.   BLM adequately analyzed the effectiveness of the proposed mitigation measures.

ONDA argues that BLM failed to analyze the effectiveness of the proposed mitigation measures, in violation of NEPA.  (Pl. Opening Br. [37] at 48.)  The purpose of discussing mitigation in the NEPA analysis is to evaluate whether environmental impacts can be avoided. *Robertson*, 490 U.S. at 351–52.  To serve this purpose, the discussion of mitigation must contain an evaluation of "whether the proposed mitigation measures can be effective." *S. Fork Band*, 588 F.3d at 727.

The effectiveness of many of the measures contained in the mitigation plans is obvious. For example, reducing the number of noxious weeds and re-seeding with native vegetation such as sagebrush will necessarily improve the sagebrush habitat on which sage-grouse rely.  For other mitigation measures, the FEIS provides specific details about the effectiveness.  For example, the FEIS states that transmission line marking devices "have been reported to reduce [avian] collision mortalities by 40 to 90 percent."  AR 02234.

For the remaining sage-grouse mitigation measures, I find that it was not necessary for BLM to independently analyze effectiveness because it adopted a HMP based on the ODFW Mitigation Framework, which the parties and the cooperating agencies agree is a cutting-edge document that represents the best science on sage-grouse conservation.[8]  AR 00116; AR 03001; AR 05119; Tr. at 20.  The HMP includes methods such as modification of livestock grazing, juniper control, weed control and related seeding, fire control, erosion control, habitat protection, and broader habitat enhancement.  Because the HMP required management according to the best available mitigation plan, it was reasonable for BLM to proceed under the HMP without

---

[8] In commenting on the FEIS, ODFW stated, "The Department and USFWS recommend use of the Department's Mitigation Framework as the best scientifically defensible methodology for identifying project affected area and appropriate mitigation actions for sage-grouse and other wildlife."  AR 05119.

undertaking its own analysis of the effectiveness of each individual mitigation measure in the plan.

BLM also was not required to analyze the effectiveness of individual eagle, bird, and bat mitigation measures at the FEIS stage because it adopted the Avian Plan, which contemplated an adaptive management approach with ongoing monitoring.  AR 02946.  In an adaptive management scheme, ongoing monitoring and data collection inform decisions about the effectiveness of past mitigation and what mitigation is necessary in the future.  "Allowing adaptable mitigation measures is a responsible decision in light of the inherent uncertainty of environmental impacts, not a violation of NEPA.  It is certainly not arbitrary or capricious." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 517 (D.C. Cir. 2010).

The FEIS also provides for a Technical Advisory Committee, composed of representatives from BLM, FWS, ODFW, CEP, and Harney County to provide advice and recommendations for developing and implementing mitigation.  AR 02197.  This additional safeguard will further ensure that mitigation efforts will be effective.  For all of the above reasons, I find that the FEIS's discussion of mitigation and its effectiveness was not arbitrary and capricious.

## VII.    BLM was not required to allow public comment on the changes it made between the Draft and Final EIS.

In response to comments on the DEIS and as a result of further study, BLM added pages of new information to the FEIS.  *See, e.g.*, AR 02171–72; AR 02184–88; AR 02190–91.  At oral argument, ONDA clarified that one of its main objections to BLM's action is that the agency incorporated "wholesale changes" in the FEIS and did not request public comment on these changes.  Tr. at 15.  ONDA argues that the changes to the FEIS were so significant that the agency should have requested public comment.

However, the NEPA regulations do not require BLM to request public comment on a FEIS.  40 C.F.R. § 1503.1.  The regulation states, "An agency *may* request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10."  40 C.F.R. § 1503.1 (emphasis added).  Under the regulations, BLM may but is not required to request comments on an FEIS.  Even if the agency does not request comments, "agencies or persons" may comment before the final decision is issued.  40 C.F.R. § 1503.1

Here, the FEIS was released on October 21, 2011, and the ROD was issued on December 28, 2011.  Though the regulations only require 30 days between issuance of the FEIS and the ROD, 40 C.F.R. § 1506.10(b)(2), there was a 68-day window here in which ONDA could have brought its concerns to the agency's attention in comments.[9]

When new information emerges after the DEIS, it may be validly included in the FEIS without recirculation.  *Wetlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004).   This is consistent with the format of the NEPA regulations, which establish a system where the agency will incorporate changes in the FEIS based on comments received on the DEIS.  If the agency were required to request further comments every time it made changes to the FEIS, the process could become mired in an endless loop of comments and the resulting changes until all parties were completely satisfied with the EIS or had collapsed behind the tortoise at the finish line.  This would have the effect of delaying agency action indefinitely, which is not the purpose of NEPA.

The NEPA regulations do not contemplate this type of system, and I decline to impose on the agency a requirement to request comment on the FEIS when the regulations are permissive.  Under 40 C.F.R. § 1503.1(b), ONDA had the opportunity to raise its concerns during the 68-day

[9] ONDA's failure to do so increases my concern about post-ROD expert opinion testimony.  *See supra* note 6.

period between the FEIS and ROD.  If this was insufficient time, ONDA could have requested additional time to comment.  It did neither of these things.  Therefore, I find that BLM's decision not to request public comments on the FEIS was not arbitrary and capricious.

## CONCLUSION

Because I find that BLM's decision was not arbitrary and capricious, I grant BLM's motion [51] for summary judgment.  For the same reason, I also grant CEP's motion [46] for summary judgment and Harney County's motion [44] for summary judgment.  I deny ONDA's motion [37] for summary judgment.  I also deny the motions [48, 53] to strike extra-record declarations filed by BLM and CEP.


IT IS SO ORDERED.

DATED this   11th    day of September, 2013.


/s/ Michael W. Mosman
MICHAEL W. MOSMAN
United States District Judge